JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



10 CIV 7996

------------------------------------------------------X

SERIFOPOULO SPECIAL MARITIME          :
ENTERPRISE                            :
                                      :
              Plaintiff,              :
                                      :    10 CV _____
       - against -                    :    ECF CASE
                                      :
FUELS AND FREIGHT RESOURCES           :
CORPORATION                           :
                                      :
              Defendant.              :
------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, SERIFOPOULO SPECIAL MARITIME ENTERPRISE ("Plaintiff"), by and

through its attorneys, Tisdale Law Offices LLC, as and for its Verified Complaint against the

Defendant, FUELS AND FREIGHT RESOURCES CORPORATION, ("Defendant"), alleges,

upon information and belief, as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.     At all material times to this action, Plaintiff was a foreign company duly

organized and operating under foreign law with an office and place of business in Greece and

was the Owner of the M/V SERIFOPOULO ("Vessel").

3.     Upon information and belief, at all material times, Defendant was a foreign

corporation or other business entity organized and existing under foreign law with an office and

place of business in Florida, and was the Charterer of the Vessel.

4.     Pursuant to the terms of an ASBATANKVOY charter party with Riders, dated September 13, 2010, the Plaintiff chartered the Vessel to the Defendant for one voyage to transport a cargo of fuel oil from Texas to the Dominican Republic. *See Exhibit 1.*

5.     The charter party required that the Defendant load a cargo of fuel oil within the laycan of September 18-19, 2010.

6.     The charter party further required that the Defendant would pay a freight rate for the Vessel's service in the amount of one lump sum payment of $345,000.00 with an extra charge depending upon discharge terms.

7.     The charter party also had a demurrage clause which required the Defendant to pay demurrage in the amount of $16,000 per day pro rata for any additional time beyond the 72 hour laytime for loading a cargo.

8.     In compliance with the charter party terms, the Plaintiff delivered the Vessel to the Defendant within the laycan period and properly tendered her Notice of Readiness to receive the intended cargo.

9.     In breach of the charter party terms and condition, the Defendant failed to provide a cargo and failed to fulfill its obligations to do so as required by the charter party, and incurred significant demurrages charges for its failure to provide a cargo.

10.    Despite due demand, and in breach of the charter party, the Defendant failed to provide a cargo, thus depriving the Plaintiff of freight; and, has further failed to pay outstanding demurrage due and owing to the Plaintiff.

10.    As a result of the Defendant's breaches of the charter party, the parties entered into an Addendum to the charter party dated October 12, 2010. *See Exhibit 2.*

11.     Pursuant to the Addendum, the parties agreed that the charter party would be cancelled and that the Defendant would pay damages to the Plaintiff in the amount of $525,000.00 in two installments, on October 15 and November 15, 2010 respectively.

12.     The Addendum states that if the first installment of the terms of the Addendum is not received on the due date, then all installments shall be accelerated.

13.     The Addendum further states that "All of Owners rights and remedies under the Charter Party shall survive until the cancellation fee is paid in full."

14.     The Addendum further states that it is to be construed according to the law and arbitration terms as provided for in the captioned charter party.

15     The Defendant has breached the charter party as well as its Addendum.

16.     The charter party is subject to New York arbitration with U.S. law to apply.

17.     The Plaintiff is preparing to commence New York arbitration pursuant to the charter party.

18.     Plaintiff has sustained damages in the total principal amount of **$525,000.00** exclusive of interest, costs and fees.

19.     Despite due demand, Defendant has failed to pay the amounts due to Plaintiff under the charter party.

20.     Upon information and belief, the Defendant maintains bank accounts at Citibank, N.A.

21.     Thus, it is anticipated and expected that funds in U.S. dollar are maintained at Citibank, N.A.

22.     As best as can now be estimated, Plaintiff expects to recover the following amounts as its damages under the charter party:

| A. | Principal claim: | $525,000.00 |
| B. | Estimated interest on claims:<br>2 years at 5%, compounded quarterly | $54,855.20 |

**Total**                                                      **$579,855.20**

23.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of Citibank, N.A.

24.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendant held by Citibank, N.A. within the District for the purpose of obtaining personal jurisdiction over the Defendant, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it in the sum of **$579,855.20**.

B.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits,

4

letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$579,855.20** belonging to the Defendant, including such property as may be held in Defendant's name at, or within the possession, custody or control of Citibank, N.A., and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

      C.     That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any arbitration award or judgment in Plaintiff's favor against the Defendant as a judgment of this Court;

      D.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

      E.     That the Plaintiff have such other, further and different relief as the Court deems just, proper and equitable.

Dated: October 20, 2010
      New York, NY

                The Plaintiff,
                SERIFOPOULO SPECIAL MARITIME
                ENTERPRISE

      By:          
                Claurisse Campanale Orozco (CC 3581)
                Thomas L. Tisdale (TT 5263)
                TISDALE LAW OFFICES LLC
                60 West 42ND Street, Suite 1638
                New York, NY 10165
                (212) 354-0025 – phone
                (212) 869-0067 – fax
                corozco@tisdale-law.com
                ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of New York )
                 )    ss.:    City of New York
County of New York )

1. My name is Claurisse Campanale-Orozco.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an Associate in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        October 20, 2010
               New York, NY

                                     _Claurisse C-Orozco_
                                     Claurisse Campanale-Orozco

# EXHIBIT 1

Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977

CODE WORD FOR THIS
CHARTER PARTY:
ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

STAMFORD, 13 SEPTEMBER 2010
Place        Date

IT IS THIS DAY AGREED between __SERIFOPOULO SPECIAL MARITIME ENERPRISE__ owner/ owner (hereinafter called the "Owner") of the __GREEK FLAG – 1995 BUILT__ SS/MS M/T __SERIFOPOULO__ (hereinafter called the "Vessel") and __FUELS AND FREIGHT RESOURCES CORPORATION__ (hereinafter called the "Charterer") that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A. Description and Position of Vessel:

Deadweight: **46700 metric** tons (2240 lbs.)     Classed: **LRS**

Loaded draft of Vessel on assigned summer freeboard **12.216 meters** ft. in. in salt water.

Capacity for cargo: **50782.2 cubic meters excluding slops** tons (of 2240 lbs. each) **98%** more or less, Vessel's option.

| | | | |
|---|---|---|---|
| Coated: | **Yes** | No | **EPOXY COATED** |
| Coiled: | **Yes** | No | **STAINLESS STEEL** |

Last three cargoes: **FUEL**
Now:   Expected Ready:

B. Laydays:
Commencing: **SEPTEMBER 18, 2010**    Canceling: **SEPTEMBER 19, 2010 2400**

C. Loading Port(s): **1/2 SP TEXAS INTENTION TEXAS CITY**

Charterer's Option

D. Discharging Port(s) : **1/2 SP(S) DOMINICAN REPUBLIC RESTRICTIONS AT DISCHARGE PORT(S) KNOWN TO CHARTERERS** Charterer's Option

E. Cargo: **CHARTERERS OPTION UP TO FULL CARGO, FUEL OIL EXCLUDING CBFS AND LSWR. MAXIMUM 3 GRADES WITHIN VESSELS NATURAL SEGREGATION. VESSEL TO MAINTAIN LOADFD TEMP MAX 135 DEGREES FAHRENHEIT - MAX LOADED TEMP 160 DEGREES FAHRENHEIT AT VESSEL'S MANIFOLD. (INTENDED CARGO IS ABT 80,000 BBLS ONE GRADE OF FUEL OIL #6),** Charterer's Option

F. Freight Rate: **LUMPSUM USD 345000 1:1 IF SECOND DSICHARGE USD30,000 EXTRA. FREIGHT PAYABLE BEFORE BREAKING BULK.**
G.   Freight Payable to
**CITIBANK N.A. NEW YORK, U.S.A. CITI US33**
**For further credit:**
**CITIBANK INTERNATIONAL PLC ATHENS – GREECE SWIFT: CITIGRAA**

TELEX No.: 240121 CITI GR
AKTI MIAOULI STR. 47-49
TEL: +30 210 4292850
FAX: +30 210 4292841
In favour of: EMC INVESTMENT CORPORATION ACCOUNT No.: 0/170888/006
IBAN: GR75 0840 0020 0000 0017 0888 006
REF : M/T ....- C/P ...........
(PLSE STATE WHAT THE PAYMENT REFERS TO I.E. FREIGHT/DEMURRAGE ETC)

H.      Total Laytime in Running Hours: 72 HRS

I.      Demurrage per day : USD 16000 PDPR

J.      Commission of ——— is payable by Owner to ~~on the actual amount of~~ ~~and~~ ~~address commission~~
        ~~to when and as freight is paid.~~ SEE ELETSON COMMISSION CLAUSE.

K.      The place of General Average and arbitration proceedings to be ~~London/~~New York (strike out one). US Law
        to apply.

L.      ~~Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout~~
        ~~duration of this charter~~

M.      Special Provisions:
        ➤  MAXIMUM PORT COSTS IN DOMINICAN REPUBLIC USD 25,000 FOR OWNERS
           ACCOUNT, THEREAFTER FOR CHARTERERS' ACCOUNT
        ➤  GEOGRAPHICAL ROTATION ALWAYS TO APPLY
        ➤  MAX 4 PORTS TOTAL LOAD/DISCHARGE-
        ➤  ALL PORT CHARGES NOT COVERED BY W/S TO BE FOR CHARTERERS ACCOUNT
        ➤  OWNERS OPTION TO BUNKER VESSEL ON LADEN PASSAGE
        ➤  CHARTER PARTY FORM - ASBATANKVOY
        ➤  WSHTC
        ➤  GEN ARB NY US LAW
        ➤  If more than one port in Houston ship channel is used time, shifting and port expenses to be for
           charterers account.
        ➤  If calling at San Pedro de Macoris in the Dominican Republic, Owners MAY DEEM NECESSARY
           TO do so with an extra tug on stand by during discharge operations and two extra escort tugs when
           underway to the berth from open sea and vice versa for charterers acount and under keel clearance
           of
           a) 1 foot 7 inches at all times when alongside
           b) 10% of ships static draft when underway transiting to and from the berth to open sea.

        All weather delays in Jamaica to count as full laytime. Berthing always subject to Master's
        discretion regarding safety. All delays, if any, in this regard waiting berth at Port Kaiser to be for
        Charterers account.
        ➤  Documents clause: Maximum 3 hours awaiting cargo documents to be for Owner's account.

ADD'L  CLAUSES AS ATTACHED BELOW.

Adam Terms dated Jan. 1, 1992 as amended and attached are deemed incorporated in this Charter.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be
executed in duplicate as of the day and year first above written.

Witness the signature of:

                                        By:     _____

Witness the Signature of:

                                        By:     _____

2

1. WARRANTY-VOYAGE-CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat) and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk not exceeding what she can reasonably stow and carry over and above her bunker fuel consumable stores boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading direct to the Discharging Port(s) or so near thereunto as she may safely get (always afloat) and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may at the Master's option and shall upon request of the Charterer proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge or from bunkering port for the voyage or upon signing this Charter if the Vessel has already sailed. However Charterer Shall have the option of ordering the Vessel to the following destinations by wireless orders:

> *On a voyage to a port or ports in:*

| | |
|---|---|
| ST KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said ) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

> *Place*        *On a voyage to a port or ports in:*

| | |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expenses incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the canceling date stipulated in Part I, the Charterer shall have the option of canceling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect..

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge the Master or his agent shall give the Charterer or his agent notice by letter telegraph wireless or telephone that the Vessel is ready to load or discharge cargo berth or no berth and laytime as hereinafter provided shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i. e., finished mooring when at a sea loading or discharging terminal and all fast when loading or discharging alongside a wharf whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night time so lost shall not count as used laytime if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere hereto provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival which shall be designated and procured by the Charterer provided the Vessel can proceed thereto lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expenses, all power necessary for discharging as well as loading but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo Venezuelan Habilitation Tax, C I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel on freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo) including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any

3

wharf dock place or mooring facility arranged by the Charterer and to be employed for loading or discharging the cargo may be otherwise ordered shall be responsible for charges for such berth when used solely for Vessel's purposes such as awaiting Owner's orders tank cleaning repairs etc. before during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100oF.) in excess of thirteen and one-half pounds (13,5 lbs ) as determined by the current A.S.T.M. Method (Reid) D-323

(b) FLASH POINT Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115oF.) (closed cup) A.S. T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice the Vessel shall direct her course according to Master's judgment notifying by telegraph or radio  if available, the Charterers, shipper or consignee who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception

of the cargo in bulk. The whole  of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged the Master shall communicate by telegraph or radio if available with the Charterer shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk or to remain at the original port at their risk and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or  combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description ; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists any delay thereby caused to the Vessel shall count as used laytime' but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel prior to or after entering upon this Charter has docked or docks at any wharf which is not rat-free. or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of

fumigation .

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from

(a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:-any act, neglect, default or barratry of the Master pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other lose or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner shipper or consignee of the cargo their agents or representatives insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have

her properly manned  equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer shall unless otherwise in this Charter expressly provided be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:-Act of God; act of war perils of the seas act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs

and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States approved April 16 1936 except that if this Bill of Lading is issued at a place where any other Act ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels August 1924 then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not for which or for the consequence of which, the Owner is not responsible by statute contract or otherwise the cargo shippers consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and as to matters not provided for by those rules according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter if a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

4

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in as far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying Vessel or Owner.  The foregoing provisions shall also apply where the owners operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or Vessel are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY.  Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the p provisions of the Charter Party (provided such other port is not blockaded on that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited) if in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and of discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages destinations zones, waters delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots to tow or to be towed, to go to the assistance of vessels in distress to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage.  Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS.  The Owner shall appoint Vessel's agents at all ports

23. BREACH.  Damages for breach of this Charter shall include all provable damages,  and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final.. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found of a written notice specifying the name and address of the arbitrator chosen by the first moving part and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not by notice served upon an officer of the first moving party within twenty days of the advice of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified the the first moving party shall have the right without further notice to appoint a second arbitrator who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city- abovementioned for the appointment of a third arbitrator and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel However,  Charterer  shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer a program covering oil pollution avoidance. Such program prohibits discharge overboard of al1 oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer

The oil residues will be pumped ashore at the loading or discharging terminal either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange.  If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded Charterers shall pay for any deadfreight so incurred

Should it be determined that the residue is to be co-mingled or segregated on board the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

5

Shipped in apparent good order and condition by _____

on board the_____Motorship_____

whereof _____is Master, at the port of _____

_____

_____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

                                                                    contract
This shipment is carried under and pursuant to the terms of the charter dated New York/London _____

between _____and _____

                                            contract
Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

        Dated at _____this _____day of _____

                                                    _____

                                                                                    Master

    end

1. **PRIVATE AND CONFIDENTIAL CLAUSE**
   All negotiating and details resulting in this fixture to be kept strictly private and confidential.

2. **GENERAL AVERAGE/ARBITRATION - Amended**
   Charter Party form ~~Asba II~~ ASBATANKVOY with New York Law to apply and General Average and Arbitration New York.

3. **WORLDSCALE HOURS, TERMS AND CONDITIONS - AMENDED**
   To the extent that they do not conflict with any other terms and conditions of this Charter Party Worldscale Hours, Terms and Conditions to apply.

4. **YORK ANTWERP RULES**
   York Antwerp 1974 amended ~~1990~~ **1994** Rules to apply.

5. **US COAST GUARD COMPLIANCE**
   Owner certifies that during the term of this Charter Party the vessel will be in full compliance with US Coast Guard Pollution Prevention Regulation as specifically described as 33 CFR Parts 154, 155 and 156 or will hold necessary waivers if not in compliance. Any delays as a result of non-compliance shall not count as used laytime.

6. **FMC CLAUSE - NOT APPLICABLE**
   ~~Owner warrants to have secured and carries aboard the vessel a US Federal Maritime Commissions Certificate of Financial Responsibility as required under the US Water Quality Improvement Act of 1970 (effective 0001/April 3, 1971).~~

7. **REVISED P AND I TOVALOP CLAUSE - ITOPF Clause applies**
   **Owners warrant that they are a member of ITOPF and will remain so for the duration of this voyage.**

8. **OVERAGE ON CARGO**
   Overage on cargo to be 50 percent of the agreed rate.

9. **CONOCO WEATHER CLAUSE**
   Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions shall count as one-half laytime or, if on demurrage, at one-half demurrage rate.

10. **ELIGIBILITY CLAUSE - Amended**
    Owners warrant **to the best of their knowledge** that the vessel is completely free to trade within IWL and is not in any way listed as unacceptable by any major oil company, government whatsoever, nor is she debarred by any activity of any port within load or discharge areas within agreed ranges. **Owners warrant to their best of their knowledge that vessel is approved by BHP —** ~~RIGHTSHIP/~~VALERO

11. **VESSEL-TO-VESSEL TRANSHIPMENT CLAUSE - Amended**

7

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

Weather permitting and subject to Master's approval which not to be unreasonably withheld, Owners warrants vessel will, if requested, perform a safe vessel-to-vessel transhipment operation at ~~sea at a location other than~~ the customary anchorage for the load and discharge port(s) in which event Charterer will provide the lighterage vessel, fenders, hoses and all other equipment or services necessary for a safe operation at their expense. Owners agree to allow supervisory personnel on board, including mooring Master, to assist in the operation. Time consumed from vessel's arrival at the lightering location until the cargo hoses are disconnected shall count as used laytime, as calculated in Part II hereof or demurrage if the vessel is already on demurrage.

The transhipment location shall not count as an additional discharge port or discharge berth when computing freight based on published Worldscale rates **unless this location is defined as a transhipment location by Worldscale. Weather delays to count in full.**

12. **LIGHTERAGE CLAUSE - Amended**
If lighterage is required to berth at a discharge port it may be necessary to lighten the Vessel while anchored at anchorage.  Laytime at anchorage shall be calculated in accordance with Part II of this Charter Party.  Although time used in lighterage shall count as laytime or demurrage, such anchorage shall not be considered a second discharge port or second discharge berth and running time from anchorage to discharge berth shall not count as laytime (whether or not the vessel is on demurrage), **unless this location is defined as a transhipment location by worldscale.**
**All weather delays to count as full time used as laytime or demurrage if vessel is on demurrage.**

13. **BILL OF LADING CLAUSE - Amended**
Discharge port shown in Bill of Lading does not constitute a declaration of discharge port and Charterers to have the right to order vessel to any port within terms of the Charter Party.  Charterers hereby indemnify Owners against claims brought by holders of Bills of Lading against Owners by reason of change of destination.  Such indemnity to be drawn on Owner's P and I Club form **and to be signed by ST Shipping PTE.**
Should the Bill of Lading not arrive at discharge port in time then Owner to release the entire cargo without presentation of the Original Bill of Lading.  ST Shipping PTE **shall** ~~or first class cargo receiver hereby~~ indemnify Owner against all consequences of discharging entire cargo without presentation of an original Bill of Lading and undertake to present 3/3 Original Bills of Lading as soon as possible after vessel's arrival at the discharge port.  Letter of Indemnity to be issued and signed by Adam Maritime Corp. ~~or first class cargo receiver.~~  A bank guarantee is not required.  Owners warrant that they will return 2/3 Bills of Lading **signed by receivers on receipt of cargo duly endorsed voyage accomplished** to Charterers marked "Voyage Accomplished" within seven days of presentation, together with Owners receipt for 1/3 Original Bill of Lading.

14. **LAYTIME/DEBALLASTING/SHIFTING CLAUSE - Amended**
All laytime exemptions permitted in Clauses 6 and 7 (Part II) of this Charter Party and six (6) hours notice time permitted in Clause 6 (Part II) of this Charter Party,

shall be allowed even if Vessel is already on demurrage, **but time and expenses shifting between berths within the same port as designated by Worldscale to be for Charterer's account.**

With reference to Clause 5 (Part II) of this Charter Party it is hereby agreed that laytime shall not commence before 06.00 hours local time on the date stipulated in Part I (B) unless with Charterer's sanction **if vessel berths earlier.**

**15.   CARGO RETENTION CLAUSE –**

In the event that any cargo remains on board upon completion of discharge, Charterer shall have the right to ~~deduct~~ **claim** from freight an amount equal to the FOB port of loading value of such cargo plus freight and insurance due with respect thereto, provided that the volume of cargo remaining on board is liquid oil **and pumpable and reachable by vessel's fixed pumps** as determined by Charterer's independent surveyor.  Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of these parties.

**16.   DIVERSION CLAUSE**

Notwithstanding anything else to the contrary in this Charter Party and notwithstanding what loading and/or discharging ports may have been nominated and Bills of Lading issued, Charterer shall have the right to change its nomination of the loading and/or discharging ports in accordance with Part I, C and D of the Charter.   Any extra time and expense incurred by Owners in complying with Charterer's orders shall be for Charterers account and calculated in accordance with Part II, Clause 4 (b) of this charter.  Freight is based on the voyage actually performed.  Charterer shall have the right to make as many changes as it deems necessary.

**17.   DEMURRAGE CLAUSE - AMENDED**

In order to be honoured, any demurrage claim must be received in writing with full supporting documents including authorised statements of facts signed by Master, Supplier/Receivers **or** Agents **wherever possible** within 90 days of completion of discharge failing which the claim shall be deemed to be waived and absolutely barred.  Master is to issue Letter of Protest should documents or signatures not be available.

**18.   PUMPING CLAUSE - Amended**

~~Owners warrant the Vessel will either discharge her entire cargo within 24 hours, or maintain 100 PSI at ship's rail provided shore facilities are capable of receiving cargo at that pressure.~~

**Owner warrants that the vessel is capable of discharging the entire cargo in a maximum of 24 hours (pro rata for part cargoes) or alternatively maintain a minimum pressure at the vessels manifold of 100 psi (pounds per square inch) throughout  the entire discharge provided the receiving facilities can  accept the cargo at that rate.**

**19.   ETA CLAUSE**

Vessel to give ETA notices in accordance with Charterer's voyage instructions or, in absence of instructions, to give to Charterer ETA immediately upon sailing

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

previous discharge port and/or Charterer's loadport, and seven days and 72/48/24 hours (as applicable) in advance at both Charterers load or discharge port.
Should Owner fail to comply with the above and any delay at either load or discharge port result, such delay shall not be for Charterer's account.

20.   **WAR RISK (WHERE APPLICABLE) CLAUSE – Deleted SEE BELOW**
~~Any increase of hull and machinery was risk premiums and crew war bonus over and above those in effect on the date of the Charter Party, will be for Charterer's account. Any premiums or increases thereto, attributable to closure (i.e. blocking or trapping) to be for Owner's account. Surcharges which are in effect on the date of this Charter Party are for Owner's account.~~

21.   **OIL POLLUTION CLAUSE - Amended**
Owners warrant that they have valid cover for pollution of USD ~~700 million~~ **1 billion** with their P & I Club **through underwriters providing first class security** and that this cover will remain in place throughout this Charter. **Owners P & I Club is UK Mutual.**
Owners shall confirm to Adam Maritime Corp. within ~~one (1) business day~~ **(3) three business days** after the fixture is concluded, writing evidence from the vessel's P& I Club/responsible insurance broker of P & I pollution cover of USD ~~700 million~~ **1 billion** and cover will be in effect during the entire period of this Charter.
~~The vessel's P & I Club/responsible insurance broker must be acceptable to Adam Maritime Corp. or if written evidence is not received by Adam Maritime Corp. within the one (1) business day, Adam Maritime Corp. shall have the right to cancel said fixture within one (1) business day from the day the Owner is required to present to Adam Maritime Corp. verification of such pollution coverage.~~

22.   **CLEAN BALLAST CLAUSE**
Vessel to arrive load port with clean ballast only.

23.   **GAS INERT CLAUSE - Amended**
If the vessel is equipped with IGS and the cargo compartments are inerted, Charterer or independent inspector shall have the right to request the Master to depressurize for the purpose of sampling, gauging, temperature determination and/or determination of the quantity of cargo remaining on board after discharge. Depressurization is to be conducted safely as described in the joint ICS/OCIMF publications International Safety Guide for Oil Tankers and Terminals and the Inert Fuel Gas Safety Guide
**Any time used for these activities shall count as used laytime or be compensated for at the demurrage rate if vessel on demurrage.**

24.   **LOAD ON TOP CLAUSE**
Unless otherwise instructed, Owner shall collect and dispose of tank washings and, in so far as such tank washings cannot be disposed of, shall collect tank washings in one tank which shall not have been included in the minimum capacity of the vessel guaranteed to be available to Charterers, and no freight shall be payable on said tank washings.

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

Charterers may instruct vessel to load on top of collected tank washings in which case freight as agreed shall be payable on the quantity of such collected tank washings, provided Owners shall ensure that the free water in such collected tank washings shall have been reduced to a minimum to Charterer's inspectors satisfaction.

25. **SAMPLING CLAUSE - Amended**
Charterer's option for Vessel to call en route from load port(s) to discharge port(s) for sampling purpose. All costs in this connection to be for Charterer's account based on demurrage rate for deviation plus bunker cost at replacement value.
Charterers shall always have the right to ullage, inspect by any means whatsoever, and sample Vessel's bunker tanks as well as Vessel's void spaces and other tanks whatsoever. Charterers shall always be allowed to inspect any or all of the Vessel's records and/or other documents on board relating in any way whatsoever to the management of the vessel, including provision of bunkers, and/or to the carriage of the cargo.

26. **CLEANING CLAUSE DELETE N/A AS LOT TO APPLY.**
**VESSEL TO LOAD ON TOP OF LAST CARGO BEING FUEL OIL, WHERE VESSEL TO STRIP AND DRAIN TANKS, PUMPS AND LINES THROUGHLY.**
Vessel to arrive at loadport with all cargo tanks, pumps, valves and pipes suitably clean to Charterer's Inspector's satisfaction in accordance with Clause 16 of this Charter Party, and further Owners to insure that all traces of sediment, tank washings or chemicals, if used, are removed from tanks, pumps, valves and pipes intended for carriage of cargo. Any delays as a result of vessel arriving at loadport, and not being to Charterers Inspectors satisfaction, to be for Owner's account.

27. **EXCESS BERTH OCCUPANCY**
If, after disconnection of hoses, Vessel remains at berth exclusively for ship's purposes, other than by reasons of Force Majeure, Owners will be responsible for direct or indirect costs charged to Charterers by terminal/suppliers/receivers.

28. **COW CLAUSE**
If COW is requested by Charterers, the time used for Crude Oil Washing up to a maximum 12 hours or pro rata on the basis of the number of cargo tanks washed to the number of cargo tanks on board Vessel, will be for Charterer's account.

29. **HEAT-UP CLAUSE - Deleted**
A.      Charterers option to request vessel to raise loaded temperature on voyage, time permitting, to maximum 135 degrees Fahrenheit.
B.      Charterers to re-imburse Owners for actual cost of additional fuel used to raise (not maintain) temperature.
C.      Payment against Owners commercial invoice.

30. **DISCHARGE/RELOAD CLAUSE – DELETED SEE BELOW**
Charterer shall have the option to discharge and reload all or part cargo at any port within the trading range. If exercised, any additional costs in connection with the reload to be Charterer's account and additional time consumed to count as used

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

laytime. For Worldscale purposes, said discharge/reload port to count as a load port under Worldscale.

31. **ADDRESS COMMISSION CLAUSE- Delete**
1.25% is payable by Owners to Charterers on all money paid. Such address commission is deductible at the source.

32. **AGENCY CLAUSE - Amended**
Owner to appoint Charterers' nominated agents at load and discharge ports **provided competitive, but agents always to be acceptable to Charterers, Charterers' acceptance not to be unreasonably withheld.**

33. **EXXON DRUG AND ALCOHOL CLAUSE**
Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel which meets and exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40mg/100ml or greater; the appropriate seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and hat all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations.
Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

34. **ADAM BIMCO STANDARD ISM CLAUSE**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. **Owners are to provide a copy of the Certificate upon request.**
Except as indicated **otherwise provided** in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners of "the Company" to comply with the ISM Code shall be for Owners' account.

35. **EXXON EARLY LOADING - DELETE**

36. **EXXON CHARTER PARTY ADMINISTRATION CLAUSE**
Charter party terms and conditions are evidenced by the fixture confirmation cable or telex approved (by answering cable/telex) by both Owner and Charterer. Except as requested in writing by either Owner or Charterer, there shall be no formal written and signed Charter Party.

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

## ADDITIONAL CLAUSES

### ELETSON COMINGLING CARGO ON BOARD CLAUSE

Owners agree if so requested to instruct master to comingle the cargo or cargoes loaded on board always in strict compliance with safety rules, and subject to the technical characteristics of the Vessel.

Charterers have in place liability insurance and warrant that cargoes to be comingled or blended on board are stable and compatible and that no precipitation of solid deposits in cargo tanks, pipes, pumps, valves should be expected.

Pursuant to compliance with charterers request to comingle, Owners will not be responsible and Charterers will keep owners harmless and fully indemnified against all claims for contamination or quality deterioration or off-spec whatsoever.

Any additional costs during comminglement / blending operation to be for Charterers account.

### ELETSON OPA CLAUSE

Save in relation to an "average most probable discharge" (AMPD) (as defined in 33 CFR 155, 1020), the vessel owner has submitted to USCG a response plan and assigned control no. 00401 by USCG which identifies the resources necessary to respond to the oil spill  scenarios required by the U.S. Oil Pollution Act of 1990 and regulations and guidelines promulgated thereunder (OPA '90).

Notwithstanding any other provision of this charter, the vessel shall discharge only at facilities (as that term is used in 33 USC 1321, as amended by OPA '90) or to any vessel which meets the requirements of OPA '90, including the obligation to file, implement and obtain approval from the U.S. Coast Guard of the relevant response plan. If the vessel is required by Charterers to lighter in U.S. territorial waters or the U.S. exclusive economic zone, owners to comply with such order only if there will be available all response resources required by the laws and regulations of the united states including resources capable of responding to an AMPD at the transfer or lightering area in the same manner as if loading or discharging is taking place at a shore facility or terminal and that the vessel will have access to the response resources, at no cost to the vessel or its owner, unless such response resources used for the clean up of a spill caused by oil spilled from the vessel.

### ELETSON CARGO HEATING UP CLAUSE

IF REQUIRED BY CHARTERERS, VESSEL SHALL RAISE CARGO TEMPERATURE BUT ALWAYS TO A MAXIMUM OF 135 DEGREES FARENHEIT.

ADDITIONAL COSTS ASSOCIATED WITH INCREASING CARGO TEMPERATURE TO BE REIMBURSED TO OWNER BY CHARTERER AT COST WHICH TO BE ADVISED, PAYABLE WITH FREIGHT.

### ELETSON WAR RISK INSURANCE CLAUSE.

Any additional war risk insurance premium and crew war bonuses over and above the rates as at 1200 hours 26th September 2001 are to be for Charterers account and to be paid together with freight against owners telex/fax/e-mail invoice.    Supporting documentation to be forwarded to charterers as soon as possible.'

### ELETSON MISSISSIPPI RIVER PORTS CLAUSE

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

IF VESSEL LOADS/DISCHARGES AT MISSISSIPPI RIVER PORTS ANY DELAYS INCURRED BEFORE OR AFTER BERTHING DUE TO HIGH RIVER CONDITIONS TO COUNT IN FULL AGAINST LAYTIME OR DEMURRAGE IF VESSEL ON DEMURRAGE. ANY ADDITIONAL EXPENSES (PORT CHARGES, TOWAGE, PILOTAGE, STAND-BY TUGS) OTHER THAN THOSE COVERING A NORMAL ONE-BERTHING ONE-UNBERTHING OPERATION SHALL BE FOR CHARTERERS ACCOUNT AND SHALL BE SETTLED DIRECTLY BY THEM. ADDITIONAL BUNKERS CONSUMED, IF NECESSARY, FOR VESSEL TO STEAM UNTIL STATE OF WEATHER IS SAFE FOR ANCHORING OR RE-BERTHING TO BE FOR CHARTERER'S ACCOUNT AND TO BE PAID TOGETHER WITH FREIGHT AGAINST OWNER'S TELEX INVOICE AS PER MASTER'S STATEMENT.

**ELETSON WAITING INSTRUCTIONS CLAUSE**
CHARTERERS TO HAVE THE OPTION TO REQUIRE VESSEL TO WAIT FOR ORDERS FOR A MAXIMUM OF TEN (10) DAYS AT A POSITION/PLACE/AREA INSTRUCTED    BY CHARTERERS AT MASTER'S DISCRETION, WITHOUT PREJUDICE TO ANY CLAIM OWNERS MAY  HAVE FOR DEVIATION. ALL TIME FROM ARRIVAL AT ANCHORAGE UNTIL DEPARTURE TO BE PAID AT **AGREED DEMURRAGE RATE IN MAIN TERMS**, PLUS EXTRA BUNKERS CONSUMED (FUEL OIL FOR MAINTAINING CARGO TEMPERATURE AND DIESEL OIL) TOGETHER WITH THE FREIGHT AGAINST OWNERS TELEXED INVOICE.

SHOULD IT BE NECESSARY FOR VESSEL TO STEAM WHILST AT THE ANCHORAGE AREA THEN TIME AND ADDITIONAL BUNKERS CONSUMED IN THIS RESPECT TO BE FOR CHARTERERS ACCOUNT AND TO BE PAID AS ABOVE AGAINST OWNERS TELEX INVOICE. AFTER THE EXPIRATION OF TEN (10) DAYS OWNERS/CHARTERERS HAVE THE OPTION TO NEGOTIATE ABOVE RATE

**AMS CLAUSE**
If cargo is to be discharged or loaded in a U.S. port or territory subject to control by the Bureau of U.S. Customs and Border patrol (CBP), Charterer's warrant that all necessary details required by CBP for clearance of the cargo, inclusive of but not limited to, Shipper, Consignee and Notify party full name, address and phone number or telex number, Will be included on each Bill of Lading or alternatively supplied to owner in writing a minimum of 36 hours prior to vessel's arrival at the first designated U.S. port of discharge and prior to commencement of loading at a US port or territory. For voyages less than 48 hours in duration this information must be included on the Bill of Lading or advised to owners prior to vessel departure from the loading place or port. Any delays, fines, penalties or other liabilities incurred due to charterer's failure to comply with the above will be for charterer's account.

Owners warrant that they are aware of the requirements of the U.S Bureau of Customs and Border Protection ruling issued on December 5th 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al. and the vessel has it own SCAC number and US Customs have issued a bond for the carrier. Any delays, fines, penalties or other liabilities incurred due to owner's failure to comply with the above or failure to submit the above requested information in a timely manner after the timely submission of same the Charterers to Owners will be for owner's account.

14

SERIFOPOULO/FFR 13 SEPTEMBER 2010
INCORPORATED CLAUSES

**BIMCO ISPS CLAUSE**

(A) (I) FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND "THE COMPANY". UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE SHALL BE FOR THE OWNERS' ACCOUNT.

(B) (I) THE CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY OFFICER (SSO)/MASTER WITH THEIR FULL STYLE CONTACT DETAILS AND ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY WITH THE ISPS CODE.

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS' ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE SHALL BE COMPENSATED AT THE DEMURRAGE RATE.

(C) PROVIDED THAT THE DELAY IS NOT CAUSED BY THE OWNERS' FAILURE TO COMPLY WITH THEIR OBLIGATIONS UNDER THE ISPS CODE, THE FOLLOWING SHALL APPLY:

(I) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, THE VESSEL SHALL BE ENTITLED TO TENDER NOTICE OF READINESS EVEN IF NOT CLEARED DUE TO APPLICABLE SECURITY REGULATIONS OR MEASURES IMPOSED BY A PORT FACILITY OR ANY RELEVANT AUTHORITY UNDER THE ISPS CODE.

(II) ANY DELAY RESULTING FROM MEASURES IMPOSED BY A PORT FACILITY OR BY ANY RELEVANT AUTHORITY UNDER THE ISPS CODE SHALL COUNT AS LAYTIME OR TIME ON DEMURRAGE IF THE VESSEL IS ON LAYTIME OR DEMURRAGE. IF THE DELAY OCCURS BEFORE LAYTIME HAS STARTED OR AFTER LAYTIME OR TIME ON DEMURRAGE HAS CEASED TO COUNT, IT SHALL BE COMPENSATED BY THE CHARTERERS AT THE DEMURRAGE RATE.

(D) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, ANY ADDITIONAL COSTS OR EXPENSES WHATSOEVER

SOLELY ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND INSPECTIONS, SHALL BE FOR THE CHARTERERS' ACCOUNT, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE OWNERS' NEGLIGENCE. ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS' ACCOUNT.

(E) IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY'S ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.

**ELETSON COMMISSION CLAUSE.**
Brokerage commission of 3.75 pct on freight, deadfreight and demurrage due to **brokers FOR DIVISION** to be payable against their original invoice. Commission to apply on revenue generating items and not reimbursable items, except Panama Canal differentials, such as fixed rate differentials as per ws.

**END+++**

# EXHIBIT 2

ADDENDUM dated October 12th 2010 to the Charter/Party between SERIFOPOULO SPECIAL MARITIME ENTERPRISE and FUEL AND FREIGHT RESOURCES CORPORATION dated 13th September 2010.

In relation to the captioned subject matter, the vessel SERIFOPOULO is currently at the port of Galveston Pilot Station, TX USA and the Charterer has still not been able to provide a cargo for the vessel.

Due to the Charterer's inability to provide a cargo to the vessel and the demurrage that is accruing on a daily basis, the Charterers have proposed to the Owners that the Charter/Party be terminated with the Charterers paying a cancellation fee to the Owners.

The Owners are willing to terminate the contract under the following specific conditions.

The Owners and the Charterers mutually agree as follows:

1) The Charter-Party is terminated effective immediately.

2) The Charterers will pay as a cancellation fee to the Owners the sum of US$ 525,000 on the following schedule:

   a) US$ 340,000 by Friday, October 15th 2010
      and
   b) US$ 185,000 on or before Monday, November 15th 2010

3) In the event the first installment is not received by the Owners by October 15th 2010, all installments shall be accelerated.

4) All of Owners rights and remedies under the Charter/Party shall survive until the cancellation fee is paid in full.

5) This addendum is to be construed according to the law and arbitration terms as provided for in the captioned charter-party.

Daniel Locasto
Eletson Corporation as agents
for and behalf of the Owners
Serifopoulo Special Maritime Enterprise
Attorney in Fact

For the Owners

For the Charterers